IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| United States of America, | ) | CR 07-01714-TUC-DCB(HCE) |
| Plaintiff, | ) | **REPORT AND RECOMMENDATION** |
| vs. | ) | |
| James T. Schmit, | ) | |
| Defendant. | ) | |

Pending before the Court is Defendant's Motion To Suppress: Consent Search and Seizure (Doc. 197). The Government filed a Response To Defendant's Motion To Suppress: Consent Search And Seizure (Doc. 200). Defendant's Motion came on for hearing on October 14, 2010. Immigration and Customs Enforcement (hereinafter "ICE") Agents John Czapko, Craig Brisbine, and Department of Homeland Security Special Agent John Owen (hereinafter "SA Owen") testified (hereinafter "Czapko at p. _", "Brisbine at p. _", and "Owen at p. _") on behalf of the Government. Defendant testified (hereinafter "Schmit at p. _") on his own behalf. Transcript of the October 14, 2010 evidentiary hearing was ordered by the Magistrate Judge, filed on November 4, 2010 (Doc. 247), and is forwarded to the District Court for review. Admitted into evidence were: (1) Government Exhibit 3: Consent form; (2) Government Exhibit 4: Photograph of living room; (3) Government Exhibit 5: Photograph of kitchen; (4) Government Exhibit 6: Photograph of music studio; (5) Government Exhibit 7: Photograph of master bedroom; (6) Government Exhibit 8:

Photograph of spare bedroom; (7) Government Exhibit 9: Photograph of garage; (8) Government Exhibit 10: Agent Czapko's notes; and (9) Defendant's Exhibit E: Floor plan of residence.

After consideration of Defendant's Motion, the Government's Response, testimony, exhibits, and argument of counsel, the Magistrate Judge recommends that the District Court deny Defendant's Motion To Suppress: Consent Search and Seizure (Doc. 197).

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A.     Indictment

Defendant is charged with: from a time unknown to on or about May 11, 2005, in the District of Arizona, knowingly transporting and shipping in interstate and foreign commerce, by any means, including by computer and by mail, visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. §§2252(a)(1), (b)(1) and 2256(2) (Counts 1 through 9); from a time unknown to on or about May 11, 2005, in the District of Arizona, knowingly transporting in interstate commerce for the purpose of sale and distribution, a computer hard disk drive and computer storage media containing visual depictions related to sadistic and masochistic conduct, bestiality, child pornography, and other obscene material, in violation of 18 U.S.C. §1465 (Counts 10 through 24); and on or about May 11, 2005, in the District of Arizona, knowingly possessing visual depictions that had been mailed, shipped and transported in interstate and foreign commerce, by knowingly possessing a computer hard disk drive and computer storage media which contained images and videos that were part of a collection of visual depictions of minors engaging in sexually explicit conduct, in violation of 18 U.S.C. §§2252(a)(4)(B), (b)(2) and 2256(2) (Counts 25 through 33)[1]. Moreover, the Government posits a Forfeiture Allegation that as a result of the foregoing offenses, Defendant forfeits any and all interest in any and all matter which contains visual depictions in violation of Counts 1 through 33, and any all property used and

---

[1]The visual depictions of child pornography alleged in Counts 1 through 9 are the same visual depictions alleged in Counts 25 through 33.

- 2 -

intended to be used to commit and promote the commission of the aforesaid, is forfeitable to the United States.

### B. Factual Background

In 2005, Agent Czapko's primary area of investigation was child exploitation. (Czapko at p. 6). He received information from the Minneapolis, Minnesota ICE office that Defendant had purchased internet subscriptions to child pornography sites using his credit cards and had subsequently moved to Tucson, Arizona. (*Id.* at pp. 6, 44). After determining that Defendant resided in Tucson, Agent Czapko investigated whether Defendant had subscribed to child pornography sites while in Tucson and determined that he had not. (*Id.* at p. 7). Agent Czapko did not have enough information to obtain a warrant. (*Id.* at pp. 7-8). Consequently, his agency decided to conduct a "knock and talk" at 6:50 a.m. on April 6, 2005, to interview Defendant to determine whether he had legitimate credit card fraud problems, and if not, to inquire whether Defendant would consent to a search to determine whether the investigation should continue. (*Id.* at pp. 7, 9, 47, 50, 57). Agents had surveilled Defendant's residence for "a week or so" to determine his movements to and from his residence and concluded that the early morning hours was an opportune time to conduct the "knock and talk." (*Id.* at pp. 58-59).

Agents Czapko and Brisbine adhere to the Internet Crimes Against Children Task Force standards when conducting a "knock and talk", which includes being the least adversarial to an intended interviewee because the investigation may only be a matter of credit card fraud or stolen identity. (*Id.* at pp. 9-10). Consistent with these standards, on April 6, 2005, Agents Czapko and Brisbine were dressed in plain clothes[2], wore protective vests under their shirts, and carried concealed firearms not readily visible[3] to Defendant, when they

---

[2] Defendant testified that when he opened the front door to his home in response to someone knocking, he saw two individuals dressed in law-enforcement uniforms. (Schmit at p. 190).

[3] Defendant testified that it was obvious to him that Agents Czapko and Brisbine were carrying weapons because he saw weapons. (Schmit at p. 195). Agent Czapko testified that

- 3 -

approached Defendant's residence. (*Id.* at pp. 10-11, 70-71). There were other agents in the area, but they were not visible from Defendant's residence. (*Id.* at pp.10-11).

Agent Czapko knocked on the front door of Defendant's residence and Defendant came to the door. (*Id.* at p. 60; Brisbine at p. 88). Agents Czapko and Brisbine had stepped away from the door after knocking. (Schmit at p. 192). Agents Czapko and Brisbine did not announce or identify themselves until after Defendant opened the front door. (*Id.* at p. 190; Czapko at p. 60). Once Defendant opened the door, the agents identified themselves as law enforcement and showed their identification to Defendant. (Czapko at pp. 10, 11). Defendant was dressed in a robe and appeared to have been sleeping. (Brisbine at pp. 100-102).

Defendant testified that he had been sleeping at the time and heard pounding on the front door loud enough to wake him. (Schmit at pp. 188-189). He thought at the time that it was Jehovah's Witnesses who had been to his residence the week before. (*Id.* at p. 188). Defendant believes it took about a minute to respond to the knocking. (*Id.* at pp. 188-189; *see also* Czapko at pp. 60-61; Brisbine at p. 88).

Agent Czapko explained to Defendant that a credit card, presumably issued to him, had been used to subscribe to web-sites focused on child pornography. (Czapko at p. 13). Defendant responded that he had been a victim of identity theft and that he was willing to answer questions to clear the matter. (Brisbine at p. 105). Defendant: (1) told the agents they could come in; (2) did not deny the agents access; (3) never told the agents they must leave because he felt he had no other option; (4) cannot say, because he cannot remember, if the agents said that he did not have to let them in; but (5) was not reluctant or hesitant in letting the agents into his residence. (Schmit at pp. 192-193, 201, 222; Czapko at 13; Brisbine at p. 89). Once inside Defendant's residence, the agents brought up the issue of credit card

---

he wore a handgun on his hip underneath his shirt and if Defendant "was observant, he would have observed the bulge." (Czapko, at p. 70). Agent Czapko also testified that Agent Brisbine's firearm could not have been visible because he carries it in an ankle holster. (Czapko at p. 11). Agent Czapko did not know whether Agent Brisbine also carried a gun at his hip. (*Id.* at p.71)

- 4 -

1    purchases to which Defendant stated that he had had credit card problems a number of years
2    earlier. (Czapko at pp. 14, 62). The agents made efforts to get documentation for those
3    problems. (*Id.* at p.14). Defendant spoke freely during this time. (*Id.* at pp. 14-15; Brisbine
4    at p. 90). Conversation with Defendant progressed to determining the number of computers
5    in Defendant's residence and the type of computer media Defendant might have to store child
6    pornography images. (*Czapko* at p. 15).

7    Much of the conversation between the agents and Defendant was about his
8    disabilities, illnesses, music, his music studio in the residence and work that he had
9    previously done in Minnesota, his Marine son, as well as the number of computers Defendant
10   had on a LAN[4]. (*Id.* at pp.15-16, 34, 64; Brisbine at pp. 90, 124; Schmit at pp. 224-225).
11   Defendant had twelve computers serviced on a LAN. (*Id.* at p.16). The next step taken by the
12   agents was to obtain consent from Defendant to examine his computers and computer media.
13   (*Id.* at pp. 16-18). The agents explained to Defendant that they have an expert who can
14   examine his computers utilizing certain search systems for child pornography that would not
15   alter his computer. (*Id.* at p. 18). Defendant was not hesitant in assenting to their request. (*Id.*
16   at pp. 18-19).

17   Defendant opines, however, that: (1) despite what the agents observed of him, he was
18   extremely intimidated, afraid and nervous because the agents had firearms; (2) even though
19   the firearms were never drawn, the fact that they had firearms is enough to intimidate him;
20   and (3) despite being treated with civility, everyone knew who was in charge. (*Id.* at pp. 203-
21   205, 209). Defendant agrees that from the agents' perspective they were allowed to enter
22   his residence, search the computers and computer media, and image the PC Taylor computer
23   – but "they had guns. That's all I need[ed]." (*Id.* at p. 215).

24   Defendant signed a consent form and: (1) agreed to a complete search of a PC Taylor
25   computer hard drive; (2) agreed that the agents were authorized to take from his residence

---

[4]A LAN is a Local Area Network wherein a number of computers are set up to work from one local hard drive which has access to the internet. (Czapko at p. 16).

- 5 -

1   the imaged PC Taylor computer hard drive; (3) acknowledged that any contraband data or
2   material which is evidence of a crime may be used against him in a court of law; (4)
3   acknowledged that the written permission to examine and image the PC Taylor computer
4   hard drive was voluntary; (5) acknowledged that he had not been threatened, placed under
5   duress or promised anything in exchange for his consent; (6) acknowledged that he had read
6   the form, that it had been explained to him, and that he understood it; and (7) acknowledged
7   that he could withdraw his consent at any time for any reason. (Government Exhibit 3).
8   Defendant has no reason to deny he signed the consent form. (Schmit at p. 223). While the
9   agents were in Defendant's residence, they were never overtly physical or moved
10  aggressively nor did they make any verbally blatant accusations. (*Id.* at pp. 208, 212, 224;
11  232).

12  Agents Czapko and Brisbine sat down with Defendant and saw him read the consent
13  form, determined that he understood what he would be signing, and witnessed Defendant
14  signing the consent form without hesitancy. (Czapko at pp. 26-28; *see also* Government
15  Exhibit 3). Defendant: (1) was not told he was obligated to sign; (2) was not told that he had
16  to give consent to the agents to image the hard drive; and (3) was witnessed reading the
17  consent form and did not express confusion or problems with understanding the consent form
18  nor did he waiver in giving his consent. (Czapko at pp. 27-28). Defendant did not revoke his
19  consent or say anything indicating that he was having second thoughts about having given
20  consent. (*Id.* at p. 28).

21  After Defendant signed the consent form, SA Owen was called to Defendant's
22  residence to examine computers and computer media. (*Id.* at p. 20). After his arrival at
23  Defendant's residence, SA Owen tried to determine from Defendant which of the twelve
24  computers was hooked up to the internet. (*Id.* at p. 22). Defendant allowed SA Owen to
25  examine three computer hard drives, which Defendant selected, and Defendant also selected
26  some disks for SA Owen to examine as well. (*Id.* at pp. 22-23; Brisbine at p. 92; Owen at p.
27  135).  A cursory 1-hour search of the computers and disks revealed no images of child
28  pornography. (Czapko at pp. 24, 77; Owen at pp. 139, 169). SA Owen asked Defendant for

1 permission to image one of the selected hard drives, i.e., the PC Taylor computer hard-drive, 2 that was hooked up to another computer, Defendant agreed to this and the process took 1 ½ 3 hours. (Czapko at pp. 25-26; Owen at p. 139; Government Exhibit 3). Defendant declined 4 to let the agents examine other hard drives and disks, or to image other hard drives or disks, 5 nor did he permit them to remove any of his computer hard drives or disks. (Brisbine at pp. 6 91-93; Owen at pp. 135, 157).

7 While SA Owen imaged the PC Taylor computer hard-drive, Defendant continued to 8 engage the agents in conversation about the music business, his illnesses and disability, and 9 his son, who was in the Marines. (Czapko at pp. 30, 37,65; Brisbine at pp. 90-94; Schmit at 10 pp. 224-225). Defendant accounts for his loquaciousness as being garrulous when highly 11 tense and nervous[5] and agrees he is nonetheless very lucid and well-controlled during such 12 times. (Schmit at pp. 204, 217). Defendant never exhibited any signs of mental or physical 13 impairment. ( Czapko at p. 37). Defendant did not ask the agents to leave, did not change his 14 demeanor towards the agents, and was friendly and cooperative throughout his contact with 15 the agents. (Czapko at pp. 29-30; Brisbine at p. 94). The agents did not do anything to restrict 16 Defendant's movements while at his residence.[6] (Czapko at pp. 31-32). The agents were at 17 Defendant's residence for a total of three hours and forty minutes and left at approximately 18 10:30 a.m. (Czapko at pp. 75-76; Owen at p. 167).

19 A full forensic examination of the "mirrored" or copied PC Taylor hard-drive and the 20 proffered disks yielded images of child pornography. (Owen at p. 141). A search warrant

---

[5] Q. [Government]: How about any sort of mental impairment that caused him difficulty in communicating with you?
A. [ICE Agent Brisbine]: None that we observed.
Q. Did he in fact seem to be a rather sharp and verbal individual?
A. He seemed very lucid and he was - - like I say, he was very talkative with us especially about his music career. And he seemed very articulate in the way he spoke.
(Brisbine at p. 116).

[6] Defendant made and offered coffee to the agents but they declined the offer. (Schmit at p. 202).

- 7 -

1 was executed and served at Defendant's residence on May 11, 2005.  The search warrant
2 resulted in the discovery of other evidence giving rise to the charges alleged in the instant
3 indictment.

### C.     Analysis

It is well-established that a search without a warrant and without probable cause may be conducted upon an individual's consent provided that it is voluntary and consent was given by one authorized to give consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973); *United States v. Matlock*, 415 U.S. 164, 172 n. 7 (1974). Evidence discovered during a consent search may be seized and introduced at trial. *United States v. Fuentes*, 105 F.3d 487, 488 (9th Cir. 1997)(consent voluntary and therefore search valid because suspect gave consent by responding "search anything you want" and "go ahead" to officers' request for permission to search suspect for drugs). Consent to search is a waiver of Fourth Amendment rights. *Schneckloth*, 412 U.S. at 235 (voluntary consent constitutes a waiver of Fourth Amendment rights). Moreover, in seeking consent, law enforcement is not required to inform a suspect of his right to refuse consent, let alone educate him about the consequences of his consent:

> There is a vast difference between those rights that protect a fair criminal trial and the rights guaranteed under the Fourth Amendment. Nothing, either in the purposes behind requiring a 'knowing' and 'intelligent' waiver of trial rights, or in the practical application of such a requirement suggests that it ought to be extended to the constitutional guarantee against unreasonable searches and seizures.

*Schneckloth*, 412 U.S. at 241.

To determine whether consent has been given voluntarily, the totality of the circumstances must be examined. *Schneckloth*, 412 U.S. at 227; *United States v. Crasper*, 472 F.3d 1141, 1148-49 (9th Cir 2007)(consent to search voluntary because police did not exhibit or draw firearms when defendant consented in custody, was given Miranda warnings, and was told he could refuse to consent). Factors considered in determining voluntariness include: (1) the defendant's knowledge of the constitutional right to refuse to consent, *Schneckloth*, 412 U.S. at 227; *Crapser*, 472 F.3d at 1149 (consent to search defendant, motel

- 8 -

1 room, and duffel bag voluntary because officers told defendant he had the right to refuse
2 consent); *United States v. Brown*, 563 F.3d 410, 416 (9th Cir. 2009)(consent to search
3 voluntary though defendant not informed of right to refuse because co-occupant gave consent
4 without any prompting); (2) the extent to which defendant cooperates with law enforcement,
5 *United States v. Rosi*, 27 F.3d 409, 412 (9th Cir. 1994)(consent voluntary when handcuffed
6 defendant provided agents with key to condominium so he could change clothes and invited
7 them to search); (3) the defendant's attitude about the likelihood of discovery of contraband,
8 *United States v. Todhunter*, 297 F.3d 886, 891 (9th Cir. 2002)(consent to search cabin
9 voluntary because defendant pointed to areas where police would find firearms and drugs);
10 (4) the length of defendant's detention and the nature of questions asked of defendant,
11 *Schneckloth*, 412 U.S. at 226; *Crapser*, 472 F.3d at 1149; and (5) whether there were threats
12 of physical harm, *Schneckloth*, 412 U.S. at 226; *United States v. Haswood*, 350 F.3d 1024,
13 1029 (9th Cir. 2003)(consent voluntary partly because law enforcement did not use force).
14 The fact that a defendant may be on drugs or is mentally agitated does not necessarily render
15 consent involuntary. *United States v. George*, 987 F.2d 1428, 1431 (9th Cir. 1993)(consent
16 to search motel room voluntary though given by defendant in emergency room suffering
17 from a drug overdose).

18    Herein, Defendant's claim to have seen weapons, is not borne out by both Agents
19 Czapko's and Brisbine's testimony. Defendant's claim is belied by the fact that Agent carries
20 his firearm holstered on an ankle. Moreover, Defendant never asserts that he was exposed
21 to exhibited or drawn firearms.

22    Defendant was given a consent form that he read and signed acknowledging that he
23 understood it. The consent form advised him that his written permission to examine and
24 image the PC Taylor computer hard-drive was voluntary. He was not threatened, placed
25 under duress, or promised anything in exchange for his consent. The consent form advised
26 that he could withdraw his consent at any time for any reason.

27    Defendant was cooperative with Agents Czapko and Brisbine throughout his contact
28 with them. Defendant invited the agents into his residence after they knocked, identified

1 themselves and explained why they were there. Once inside Defendant's residence, 2 Defendant showed them his 12 computer hard-drive system, computer media, and his music 3 studio. Defendant moved about his residence to such an extent that he made and offered 4 coffee to the agents while they were there. His conversation with the agents ranged over a 5 number of personal topics unrelated to the reason for the agents being at his residence.

6 Defendant unreservedly stated to the agents that he had had identity theft problems 7 in the past which could account for the agents' concerns that his credit cards had been used 8 to subscribe to child pornography. Defendant would not allow any of his hard-drives to be 9 taken from his residence. Instead, Defendant selected three hard-drives that he allowed SA 10 Owen to examine and later agreed to let SA Owen image one of them. Agents were at 11 Defendant's residence for approximately 3 hours and 40 minutes due in no small part to 12 Defendant requiring SA Owen to examine three selected hard-drives and disks over the 13 course of 60 minutes in his residence and allowing him to image one of the three selected 14 hard-drives over the succeeding 1½ hours. During the total 3 hours and 40 minutes at 15 Defendant's residence, the agents did not query Defendant regarding child pornography, but 16 rather, were engaged by Defendant on topics of a personal nature.

17 Defendant opines that because of his disabilities and medication, coupled with the 18 agents carrying firearms, he felt nervous and pressured. Defendant testified that he labored 19 under a number of disabilities on or before April 6, 2005: (1) kidney stones; (2) recent back 20 surgery; (3) right brachial system in his right arm was severed; and (4) surgery for massive 21 empyema and an effusional infection in his right lung.  (Schmit at pp. 182-83).  However, 22 when talking to agents Czapko and Brisbine, Defendant was vague about his disabilities and 23 did not want to talk about his disabilities.  (Brisbine at pp. 99-100).  Further, Defendant had 24 been treated, as he had been told, for bi-polar disorder and major clinical depression. 25 (Schmit at p. 187).  Moreover, on April 6, 2005, Defendant was taking anti-depressants 26 (Effexor and Cymbalta) and pain medication (Fentanyl and MS-Contin).  (*Id.* at pp. 185-86). 27 Defendant believes he may have been on Percocet off and on.  (*Id.* at p.186).  Defendant 28 concedes that the agents at no time threatened him or were overtly aggressive in any way and

treated him civilly. (*Id.* at p.209). Despite Defendant's outward appearances, it is Defendant's expectations that the agents should have, nonetheless, percipiently discerned his conditions.

Neither Agents Czapko and Brisbine nor Defendant testified that consent was obtained or given after the agents made a claim of authority, such as having a search warrant or the possibility of obtaining a warrant if necessary. *See Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)("When a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search. The situation is instinct with coercion-albeit colorably lawful coercion. Where there is coercion there cannot be consent."); *United States v. Rodriguez*, 464 F.3d 1072, 1078 (9th Cir. 2006)(consent to search voluntary though officer told tenant he would secure warrant if she refused because probable cause existed to justify warrant and tenant signed consent form), *rev'd on other grounds*, 553 U.S. 377 (2008). Furthermore, Agents Czapko and Brisbine did not gain entry into Defendant's residence in an legally invalid manner. *See United States v. Hotal*, 143 F.3d 1223, 1227-78 (9th Cir. 1998)(consent to search home did not justify search warrant because consent given after officers gained entry to home under invalid search warrant).

Defendant herein did not object to Agents Czapko and Brisbine entering his residence. He expressly invited the agents into his residence once they identified themselves and stated their purpose for being at his residence. *See United States v. Shaibu*, 920 F.2d 1423, 1427, *amended* 921 F.2d 1193, (9th Cir. 1990)(consent not implied merely because defendant failed to object to officers entering apartment's open door). Once invited into the residence by Defendant, the scope of the consent search did not exceed the scope of the consent given. *United States v. McWeeney*, 454 F.3d 1030, 1034-35 (9th Cir. 2006)(scope of consent not exceeded when officer searched after asking defendant for permission). At no time did Defendant withdraw consent before the search of the hard drives, computer media, or the imaging of the PC Taylor computer hard-drive was completed. *Compare Fuentes*, 105 F.3d at 489 (consent withdrawn because suspect shouted "no, wait" when officer reached in to

grab object from defendant's pocket and defendant tried to free himself from restraint), *with United States v. Castillo*, 866 F.2d 1071, 1081-82 (9th Cir. 1988)(consent not withdrawn after defendant refused to sign written consent form).

### III. CONCLUSION

Defendant opines that a coercive environment at his residence gave him no other alternative but to let Agents Czapko and Brisbine, and SA Owens search his computer hard-drives and media:

> Q. [Government]: Okay. Now you mentioned that you did let the agents into the - - into your house.
> A. [Defendant]: I let them - - did I s - - is that a quote? I don't know.
> Q. Well, let's see.
> A. If I said I let them in?
> Q. Said you - - I thi - - the quote is you said they could come in.
> A. Okay.
> Q. Is that - - is that accurate?
> A. Yes. I did not deny them access.
> Q. Okay. And you never told them to leave?
> A. That is correct, I did not feel I had the option.
> Q. I understand and we'll get that - - how you felt - - to how you felt in a little bit. But just--just to be--just to be clear, you never told them to leave?
> A. Correct.
> Q. You never asked to leave?
> A. Correct.
> Q. You told them that they could look at your computers?
> A. Some computers.
> Q. In fact you said - - you actually said that they could look at some and not the others, right?
> A. They picked the ones they wanted to look at.
> Q. But you didn't - -
> A. And I said go ahead, look at those and those.
> Q. Okay.
> A. I offered - - they wanted to do whatever they were going to do, I had absolutely nothing to say about it. If they wanted to walk through the house and grab suitcases and walk out, there's nothing I could have done about it.

(Schmit at pp. 222-23). The fact of the matter is that Defendant permitted the agents to enter his residence; Defendant allowed the agents to search selected computer hard-drives; Defendant gave written consent to image one of the selected hard-drives to be examined at their office forensics laboratory; Defendant gave disks to the agents to examine at his residence; and Defendant never asked or told the agents to leave. The agents gave no

- 12 -

indication, let alone suggested, to Defendant that they would "grab whatever they wanted and walk out" if he did not give his consent. The agents examined only the computers and computer media that Defendant told them they could examine.

The totality of the circumstances allowing Agents Czapko and Brisbine, and SA Owen to search computer hard-drives and media that Defendant had selected himself, and the imaging of a computer hard-drive, shows that consent was given voluntarily and expressly. There was no over-reaching by the agents to obtain consent. The Government has met its "burden of proving that the necessary consent was obtained and that it was freely and voluntarily given ...." *Florida v. Royer*, 460 U.S. 491, 497 (1983)(plurality opinion).

## IV. RECOMMENDATION

For the foregoing reasons, the Magistrate Judge recommends that the District Court deny Defendant's Motion To Suppress: Consent Search and Seizure (Doc. 197).

Pursuant to 28 U.S.C. §636(b) and Rule 59(b)(2) of the Federal rules of Criminal Procedure, any party may serve and file written objections within fourteen (14) days after being served a copy of this Report and Recommendation. If objections are filed, parties should use the following case number: **CR 07-01714-TUC-DCB**.

Failure to file objections in accordance with Fed.R.Crim.P. 59 will result in waiver of the right to review.

DATED this 19th day of November, 2010.

_____
Héctor C. Estrada
United States Magistrate Judge